We have Mr. Ed Blank for the appellate, and we have Debbie Wilmer, part of the affilie. And you may proceed.  My name is Ed Blank. I'm a police attorney for the appellants, the Tellors. We're here to appeal to the Monroe County Circuit Court to bring a summary judgment in favor of First State Bank of Red Bud on an easement issue. I'd like to give a little bit of background. My clients own a home in Eagle Lake Estates, which is a subdivision in Monroe County. Throughout our brief, there's discussion about Eagle Lake Estates, and there's discussion about Eagle Lake First Division. These are unrelated subdivisions, different developers. It gets kind of confusing, but I wanted to point that out to the court. Eagle Lake Estates was planted, if possibly correctly planted, in 1987-1988. Part of Eagle Lake Estates is lot number 16, which our clients, the Tellors, own. Lot 16 has a private easement running across the 50-foot strip on the eastern boundary. It's a private easement. Private means that it's for the benefit of Eagle Lake Estates' plan owners only. Sometime after the 1987 indenture for Eagle Lake Estates and the 1988 corrective plan, another subdivision was developed by a different person. Eagle Lake Estates was developed by a person named Gruninger through a corporation called Eagle Lake Development Inc. The other development, which is adjacent to Eagle Lake Estates, which is called Eagle Lake First Edition, doesn't have the word Estates in it, but Eagle Lake First Edition was developed by a person called Stumpf, and that was about 1991. So going back to 1988, 1987, 1991, we've got Eagle Lake Estates first gets planted, and a couple years later, Eagle Lake First Edition gets planted. What importance is there to the fact that there are two different developers? Well, Your Honor, one of the areas that the bank relies on is that—let's try that. One of the areas the bank relies on is it refers to a 1987 indenture that gives Eagle Lake Development the right to have additional plants. What happens is Eagle Lake Estates didn't have additional plants. A different developer came along and put in a separate subdivision. And then what happens after that is there's a—so the indenture that gives Eagle Lake Development the right to have additional plants, we say does not control Eagle Lake First Edition. About 1995, there were some disputes between Eagle Lake Estates and Eagle Lake First Edition, and there were some agreements reached as far as the streets and roads and things, but that did not affect Lot 16 and the private easement that the tellers have. What does that private easement say? It just says private easement, Your Honor. The plant is a private easement, and that's what it says on the plant that was recorded in 87-88. It's 50 foots kind of wide. That's about the size of a street in a subdivision, isn't it? Well, it's 50 feet wide. Yeah, I know. And it says private easement, and that's what it says. That's it, huh? That's it. Okay. Now, does the bank own that property? No, Your Honor. At the time, back in 1991, the bank did not acquire or accept until foreclosure, I think, in 2009. So, we're on the bank's property. If I could jump ahead a little bit. On the bank's property, the lots 37, 38, 39 were sold once around, let's say around 1999. Sold again, and then I think a third sale, a person named Neff's bought it. And Neff's bought it, I think, around 2001. And what Neff's did, when they bought lots 37, 38, 39, what they did is they caused it to be recorded in a vacation plan. So, on Eagle Lake, First Edition, which obviously would have lots up to 39, the Neff's took their three lots, 37, 38, 39, and caused to have a vacation plan recorded. But wasn't the purpose of that, and isn't it in the plan that they came in the actual lines or the division of the lots and they're retaining the easement? Is that part of the plan? Well, let me address that, Your Honor. First of all, in their vacation plan, they can't retain something outside of the plan. So, as far as that exhibit that talks about the vacation plan where it says private easement to remain, it's a nullity because they can't control something outside of the plan. So once the plan's gone, everything's gone? Well, the real estate's still there. What they did, Neff's caused a vacation plan to be recorded, okay? The title says vacation lots 37, 38, 39. The bank argues that we only vacated lot lines and some setbacks and everything else, but we really just wanted to reduce the three lots down to one. Because the bank argues the Neff's had a concern with assessments and what the Neff's wanted to do was reassess on three lots instead of one. That makes no sense because the bank hasn't identified which lot was left. If they reduced 37, 38, 39 to one lot, what was left? Was it 37? Was it 38? Or was it 39? Those were on one. There were no assessments. They didn't pay assessments. It would also make no sense if you're trying to save money by vacating two lots, why not vacate all three and not pay assessments all three, which is basically what happened. Okay. The easement ran across all three of these? No. The original lots or just one? What we're calling private easement on Teller's property, lot 16, that's adjacent to the bank property. So what we're talking about, it's not a common area. It's not an out lot. It's part of the Teller's residential lot in the eastern portion. So on the Teller's lot, if you're looking at a plot, you'll see a 50-foot strip that goes up to the end of the property, and that's where it stops. So the easement we're talking about never extended to the bank's property. It stopped right where Teller's property stopped and where the bank's property started. So in any event, what NEST did was thought to be vacated all the lots. And the reason we know that is because the bank filed an affidavit by an employee of the bank, and in the affidavit they filed, they said lot lines were vacated, some setbacks were vacated, but the lots were not vacated. But what they did is they attached to their affidavit the vacation plan, and the vacation plan controls as far as what happened. The vacation plan says the streets, easements, and lots were vacated. That was pursuant to a Monmouth County order that was made part of that vacation plan. So that's what occurred, and the affidavit doesn't change that when the employee of the bank says we didn't vacate the lots because the vacation plan says the lots were vacated. There's a notation towards the bottom as far as the Monmouth County order on that. After that occurred, Your Honor, when there were no lots left, and it wasn't as the bank said that somehow the NEST reduced the three lots to one so they only passed out on one lot. There were no lots left, and then what happened to go forward with the foreclosure, then there was a new legal description on this property the bank owned, and that was the Meats and Bounds description. Well, the Meats and Bounds description is not part of a subdivision plan. Subdivision plans are usually a lot or something to that effect, but it's not a Meats and Bounds description. So all the lots were vacated, the bank had left the Meats and Bounds description that it foreclosed on. After the foreclosure, or during the foreclosure, the bank approached my clients, the tellers, and asked the tellers if they needed some access property. They also asked the tellers if they would be interested in purchasing the lot, and the tellers said they would and made an offer for that to go anywhere. And when they couldn't reach an agreement, the bank filed suit. So the bank filed suit, count one, saying that, you know, we have an easement to use this teller-private easement in regards to this property we have left over, which is no longer part of the Eagle Lake First Addition. Count two was they wanted an easement by necessity of the amount of cash that the court filed against them on count one. We filed numerous pleas that we believe raised all sorts of genuine issues of material fact. We talked about the private easement that the tellers had. That's a matter of law as far as if they own a plot, they have the right to rely upon the representations of the plot. We talked about the vacating of the plot by the NELS. Once the plot was vacated, it then became, it meets a balance description. There were no more lots left. It was no longer part of the Eagle Lake First Addition. And the reason that's important is because when it's no longer part of the Eagle Lake First Addition, then the bank has a problem tying in a document between Eagle Lake Estates and Eagle Lake First Addition that happened sometime after they were first planted. What the document was, as part of the brief, is basically, I think, for sanitary sewer system purposes, the owner of Eagle Lake Estates, which was Eagle Lake Development Inc., rooted there, and Eagle Lake First Addition, which was stumped. They got together and basically said, we'll combine efforts so the sanitary sewer system can be run through both subdivisions. But except for that tying, there's nothing that binds Eagle Lake Estates and Eagle Lake First Addition. So, if Eagle Lake, well, so if the bank property is no longer part of Eagle Lake First Addition, that means that document doesn't tie in to Eagle Lake Estates, and that's another issue as to why they shouldn't be allowed to use the Teller private easement. The Teller private easement has basically been unused for 20 years. It's been there, the notation's on the side, on their lot, that there's a private easement, and there's been no effort to use that at all, except once the bank got the property. And they felt, probably, that if somehow the court ruled that they had the right to use that easement, that would increase the value of the property that got through the foreclosure. That's why it's important to them to go to court to try to have the property of one grand easement or else two be implied. But we think the Monmouth County Circuit Court of Error, in terms of grand and summary judgment, we think there were many issues, genuine issues, material factors should have prevented summary judgment. Another part of our belief is we submitted an aerial photograph that showed the differences between Eagle Lake Estates and Eagle Lake First Edition, the different owners, and it also shows the private easement of the Tellers. Getting back to the affidavit that the employee of the bank signed, in addition to saying something different than what the vacated plan expressly provides, as far as a lot can be vacated, the client also said, or basically partially quoted the indenture for Eagle Lake Estates, which talked about the right to do some things after the fact with flats. But there's some elipses in this affidavit, and it stops. And what they left out is it talks about somebody can do something, but it's part of the first part. And the part of the first part is Eagle Lake Development Inc. and our agreement. So they left that out of the affidavit. So that creates the ambiguity in that regard. And as far as the Eagle Lake Estates, and as far as the flat being vacated, and then the banker signing the affidavit saying that somehow the lots weren't vacated, it's clearly contradictory. So that's a contradictory statement in the affidavit, which again gives rise to a generation to chill back, which we should be able to proceed to trial on. Another factor, Your Honor, is if Monroe County, in order to be part of a subdivision flat, you have to have a street going through or cul-de-sac for safety purposes, such as police or firemen, so they have some way to get to places. What you have now is this piece of ground with a Meats and Bounds inscription on it by the bank. And in further support that it's not part of the flat, the cul-de-sac is off, the streets are off, it's just a piece of ground sitting there, which is not consistent with Monroe County ordinances as far as being part of a flat. But that's again another generation to chill back, which we weren't allowed to proceed to trial on. So, Your Honor, for the reasons I've indicated, we're asking the court to reverse the summary judgment of the Monroe County Circuit Court and remand us so we can proceed to trial on these issues. Thank you, Mr. Blake. We'll have the opportunity for Ms. Vollmer. May it please the Court, Mr. Blake. My name is Debbie Vollmer. I represent First State Bank of Redbud in this matter. My position is that Judge Babcock and the lower court properly granted First State Bank of Redbud's motion for summary judgment on Count 1 of the complaint and entered a declaratory judgment that the easement was valid, existing, enforceable, in favor of First State Bank of Redbud, the current owner of the property behind the teller's property, in addition to any other future owners of that lot, basically declaring that the teller's lot was a subservient state and that the bank's property is the dominant state. As Mr. Blake said, the bank is the fee simple owner of the property that lies behind their property, the teller's property. We did obtain that property by deed in lieu of foreclosure from the prior owners, Chris Neff and his wife. The teller's property is Lot 16 of Eagle Lake Estates. The plat of Eagle Lake Estates, which can be found in the record at C-45, clearly shows the easement that's at issue in this case. It is a private easement that runs from Eagle Lake Drive to the property behind the teller's property. At the time that this plat was recorded, the property behind the teller's property was not part of this subdivision, was not developed at all. That plat was recorded in 1988. At the same time, there were restrictions also recorded. Those were actually recorded in 1987. They are referred to in my client's affidavit in support of the motion for summary judgment, but after Mr. Blake raised the issue that they were not fully cited, we did go ahead and address that issue, both in the trial court and in my brief on page 7 of my brief, where I laid out pretty much all of the whereas paragraphs of the Eagle Lake indentures, all of which refer to and clearly set forth that this was intended to be one segment of a larger development and that other plats may be recorded and that these other plats can be made subject to this plat and these indentures by signing off on them by the original developer, which was Eagle Lake Development, Inc. Thereafter, in 1991, Eagle Lake First Edition plat was recorded, and that's in the record. At C-89 is a larger copy of that. And Eagle Lake First Edition plat does specifically state on the plat that by execution hereof, Eagle Lake Development, Inc. subjects this plat to indenture of trust and restrictions of Eagle Lake Estates. That was signed by Eagle Lake Development, Inc. It was also notarized. Therefore, the documents, all the recorded documents in this place have been clear, well-documented, straightforward, and established that the Eagle Lake First Edition is part of Eagle Lake, part of the restrictions, entitled to the benefits and burdens of all the plats and all the recorded documents thereof. And at this point, then, now, there is a link that easement over the Teller's property actually goes to and is shown on the plat of the First Edition as the means of access to lots 37, 38, and 39 from Eagle Lake Drive. Eagle Lake Drive does not connect to 37, 38, and 39. We need this easement to get down to those three lots. Isn't it kind of unusual, though, to have a private easement versus a platted easement? Your Honor, I don't know the answer to that exactly. However, I believe that it's, as Mr. Blake said, this was, these roads, unless they were dedicated, were only to be used by the owners of the Eagle Lake Estates' various platted subdivisions. Are the public going to those lots? Right now, actually, there's been no development at all. I understand that. I think that the idea was that possibly not, that that would just be the way, the roadway, the ingress and egress to those three lots. So thereafter, when the Ness owned the property, there is a vacation plat recorded, and that is on the record at C-55. It's entirely, Mr. Blake makes an issue of the title of the document. The title of the document is Vacation Plat. Then the next line says, Lots Number 37, 38, and 39, Eagle Lake, First Edition, Monterey County, Illinois. Our consistent position this entire time has been that this vacation plat is, is very clear, well-documented, that only certain things are to be vacated, and those certain things are the lot lines between the line, the lots. The cul-de-sac, which would no longer be necessary if one is wanting to use all three as one lot, and the easements, utility easements that were around the cul-de-sac. The vacation plat is also very clear that certain things are to remain in quotes, and those would be the certain utility easements would remain. And then the vacation plat also does show on there the existing easement over the teller's property. I mean, I agree with Mr. Blake that we can't affect that on a vacation plat. That's not part of what we're, what the First Edition plat did. However, it does indicate to the court that we still need that easement. We still need that easement to get back to our three lots, and our three lots still have utility easements as shown on the First Edition plat. So really nothing on here would support arguments that all three lots were actually eliminated from the subdivision. Section 7 of the Plat Act allows a portion of the plat to be vacated, and that is our position is what exactly happened here. Portions were vacated, meaning lot lines and the cul-de-sac were vacated. Mr. Blake makes a point that the county board chairman signed this vacation plat, and it says that county board approved the vacation of the streets, easements, and lots shown hereon. That is what it says on here. However, what's shown hereon is the vacation of the lot lines and the cul-de-sac. And the easements are the utility easements. Correct. Right. Those remain. Right. Therefore, we think that overall the reported documents in this case were uncomplicated and unambiguous. They established the creation of Eagle Lake Estates, the easement across the Teller property to get to the back. Then the next step is the reporting of the plat of Eagle Lake First Edition, which shows that that particular easement is being used to get to lots 37, 38, and 39. And then we have the vacation plat. It shows that the lot lines and cul-de-sac of 37, 38, and 39 are vacated. To our view that these were unrelated subdivisions developed by a different developer really does ignore the precise and unambiguous language of the Eagle Lake First Edition plat, which was signed by Eagle Lake Development, Inc. as required by the restrictions that were reported earlier. Everything tied together exactly as it was supposed to be tied together. One of the points Mr. Blake talked about was the fact that this is now a meets and bounds description. The bank property is meets and bounds. First of all, that wasn't really addressed in his brief at all, which I would have responded to had it been. So under Supreme Court Rule 341H7, I would say that that argument should not be considered by the court. However, if you are inclined to consider that position, yes, that our description now is meets and bounds. And that is because with lot lines being vacated, correct, we didn't have an exact lot number to refer to, and therefore the county was requiring a description that just is what they required, and that is why we did that. That does not serve as any evidence at all that we understand or admit that these are not no longer, that they are not in the subdivision anymore. He also mentioned about assessments and whether they were paid or not by the previous owners of the MEPS. I submit that that's irrelevant and also, again, not argued in the brief and waived. Another argument that Mr. Blake made up here earlier is that this easement was unused for 20 years. Not argued in the brief and even not relevant, and I would submit not even quite accurate as far as had it gone this far. There would have been testimony that there was discussions about this easement for many years, and disagreements about this easement for many years, and it just took the bank needing to file a declaratory judgment action to bring this all to light, bring this before the court. He also referred to an aerial photo that appears in the record. I would submit that, again, not referred to in the brief. And also it was attached as an exhibit to something that he signed, a pleading that he signed. It was never authenticated. It was never brought before the court. I don't even know if he prepared that. Finally, another thing he argued was no minor county requirements for a road. Again, not addressed in the brief. Waived under Supreme Court Rule 341H7. In conclusion, we feel that Judge Babcock correctly granted summary judgment for the bank on count one of the complaint, finding that the easement was valid, enforceable by the bank, and acts as a means of access to the bank property at this time. Any questions? No questions. Thank you for your argument, Mr. Blunt. Thank you. Your Honor, as well, again, I'm looking at the vacation plan. Included on the space, it says the County Board of Minor County, Illinois, had written a scheduled meeting to approve the cessation of the streets, easements, and lots in Iraq. So if someone wants to infer lots means something like what it says, then our position would be that the trial support is not entitled to infer facts, and therefore, we still have a general issue material back as to what lots mean. That's unclear. Therefore, we're again asking that the summary judgment be reversed and case remanded. Thank you. Thank you, Mr. Blunt. Your briefs and arguments will take the manner of advisement.